IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Loretta Gilbert, as the Personal Representative of the Estate of Anthony Lamont Johnson and on behalf of the wrongful death beneficiaries (Estate of Anthony Lamont Johnson), | ) ) ) ) ) | C.A. No. 4:19-03267-HMH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| The United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the claims of Plaintiff Loretta Gilbert, as the Personal Representative of the Estate of Anthony Lamont Johnson and on behalf of the wrongful death beneficiaries, for medical malpractice against The United States of America. The Plaintiff filed this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq. The Plaintiff alleges that Anthony Lamont Johnson's ("Johnson") death was caused by the negligent acts and medical malpractice of Victoria Ramsey ("Ramsey"), a certified adult gerontology nurse practitioner, and Dr. Jude Onuoha ("Dr. Onuoha"), a correctional medicine physician, with the Bureau of Prisons ("BOP"). A bench trial was held from April 27, 2022 to April 28, 2022. In addition, the parties submitted post-trial proposed findings of fact and conclusions of law. Further, the Plaintiff submitted a document titled "closing remarks" In addition, the United States submitted a reply to the Plaintiff's "closing remarks."

After consideration of all of the relevant evidence of record and the arguments of the parties, the court now declares its findings of fact and conclusions of law. Should a finding of

fact constitute a conclusion of law, or vice versa, the court adopts it as such and directs that it be treated accordingly.

## I. FINDINGS OF FACT

1.      In January 2017, Johnson was 35 years old and an inmate incarcerated in the BOP at the Federal Correctional Institute - Bennettsville in Bennettsville, South Carolina. Johnson was serving a 15-year sentence.

2.      During his initial BOP medical exam on July 18, 2012, Johnson was found to have benign essential hypertension. (J. Ex. 1, Gilbert_118 - Gilbert_127.)[1] To treat his hypertension, Johnson was prescribed Hydrocholorothiazide ("HCTZ"), Lisinopril, and Metoprolol. (Id., (Gilbert_118).) In addition, an electrocardiogram ("EKG") was ordered. The EKG results, which were read by a computer, were labeled abnormal due to an inverted T-wave. (Id., (Gilbert_207).) Johnson's heart rate was documented as 58 beats per minute in the EKG. (Id., (Gilbert_207).)

3.      During Johnson's years in the BOP, Johnson was not evaluated by a cardiologist. (Tr. Trans. Vol. 2 at 47, ECF No. 75.) However, Johnson was monitored with periodic visits to the chronic care clinic. Johnson's medical records reflect that with the exception of a time period in 2015 when Johnson was noncompliant with his hypertension medications, his blood pressure was well controlled with medication. (J. Ex. 1, (Gilbert_235, Gilbert_298, Gilbert_309, Gilbert_347, Gilbert_427).) Johnson's lab work from January 7, 2015, showed elevated cholesterol of 231. (J. Ex. 1, (Gilbert_382).) In addition, Johnson's medical records reflect a

---

[1] The parties' Joint Exhibits 1 through 5 were admitted into evidence. (Tr. Trans. Vol. 1 at 229, ECF No. 74.)

history of smoking.  (Id. (Gilbert_153).)  A subsequent EKG on August 18, 2015, did not show any inverted T-wave, but was labeled abnormal heart rate of 45 due to bradycardia, which is a low heart rate.  (Id. (Gilbert_437, Gilbert_467).)  A heart rate below 60 is labeled as bradycardia. (Tr. Trans. Vol. 1 at 43, ECF No. 74.)

4.      Johnson was transferred from another BOP facility to FCI - Bennettsville on March 10, 2016.  (J. Ex. 1, (Gilbert_452).)  Dr. Onuoha has been employed as a correctional medicine physician for the BOP for approximately the last thirteen (13) years.  (Tr. Trans. Vol. 2 at 5, ECF No. 75.)  Dr. Onuoha has been at FCI - Bennettsville since 2015.  (Id., ECF No. 75.)

5.      Dr. Onuoha testified that when an inmate presents for medical treatment, before addressing an inmate's present issue, he undertakes the following procedure: identify the inmate by comparison to the identification card, review the health problem list, check allergic history, review medications, and review prior visits.  (Id. at 8-9, ECF No. 75.)  Dr. Onuoha independently recalled that Johnson was an athletic, young man.  (Id. at 12-13, ECF No. 75.)[2]

_____

[2] In Plaintiff's post-trial "closing remarks" filed after the conclusion of the bench trial, Plaintiff requests that the court take judicial notice of the Body Mass Index ("BMI") tables to support the position that Johnson was not an athletic, fit person.  (Closing Remarks 3-5, ECF No. 81.)  It is improper for the court to consider new evidence submitted for the first time after the close of evidence because it prevents the United States from having a fair opportunity to present evidence in response with respect to a factual issue that is disputed by the parties.  Further, it would be improper to take judicial notice of the BMI tables.  Pursuant to Rule 201 of the Federal Rules of Evidence, the court can take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either (1) "generally known within the territorial jurisdiction of the trial court" or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  The BMI table "screens for weight categories that may lead to health problems, but it does not diagnose the body fatness or health of an individual."  Body Mass Index, https://www.cdc.gov/healthyweight/assessing/bmi/index.html#:~:text=Body%20Mass%20Index%20(BMI)%20is,or%20health%20of%20of%20an%20individual (last visited May 18, 2022).  The BMI table calculations are thus subject to dispute and could be reasonably questioned.

6.    March 17, 2016 was the first time Dr. Onuoha examined Johnson.  On March 17, 2016,

Dr. Onuoha performed a required intake evaluation of Johnson subsequent to his transfer to

FCI - Bennettsville.  (J. Ex. 1 (Gilbert_389 - 391).)  Dr. Onuoha's medical record reflects that

Johnson had diagnoses for unspecified anemia, hyperlipidemia (elevated cholesterol), and

benign essential hypertension.  Further, the record reflects that Johnson was compliant with his

hypertension medications.  (Id. (Gilbert_389 - 391).)

7.    Dr. Onuoha testified that he recalled that Johnson had isolated systolic high blood

pressure, meaning that Johnson had an elevation only in the systolic pressure, which was

considered stage one hypertension and was not severe.  (Tr. Trans. Vol. 2 at 13, ECF No. 75);

(J. Ex. 1 (Gilbert_390).)  Dr. Onuoha testified that stage one hypertension is 140 over 90 to

150 over 99.  (Tr. Trans. Vol. 2 at 58-59, ECF No. 75.)  Dr. Onuoha testified that he

discontinued Johnson's Metoprolol and HCTZ and increased the Lisinopril dosage to treat

Johnson's hypertension in order to obtain optimal dosing with one medication as opposed to

three, which would improve compliance.  (Id. at 14-15, 17-18, ECF No. 75.) (J. Ex. 1,

(Gilbert_391).)  In addition, Dr. Onuoha testified that he had discontinued Metoprolol because

Johnson's 2015 EKG showed bradycardia with a heart rate of 45, and Metoprolol is known to

lower the heart rate.  (Tr. Trans. Vol. 2 at 16-17, ECF No. 75.)  Further, Dr. Onuoha testified

that he had discontinued HCTZ because Johnson did not like that it was causing him to urinate

frequently.  (Id. at 18, ECF No. 75.)

8.    Dr. Onuoha testified that he also reviewed Johnson's 2013 EKG and concluded that it

was not abnormal, noting that the T-wave inversion present in the 2013 EKG was not present in

the 2015 EKG, and the abnormal result was likely caused by the misplacement of the leads.

4

(Id. at 15-16, 43-44, ECF No. 75.)  Dr. Onuoha noted that the EKGs were interpreted by a computer.  (Id. at 43, ECF No. 75.)

9.      On October 12, 2016, Dr. Onuoha examined Johnson in the chronic care clinic and noted that Johnson was compliant with his hypertension medication.  (J. Ex. 1 (Gilbert_489).)  Johnson's heart rate and blood pressure were normal.  (Id. (Gilbert_489).)  Dr. Onuoha ordered lab work and a chest X-ray to check for cardiomegaly, which is an enlarged heart, because Johnson had unexplained anemia and an S3 heart sound.[3]  (Id. (Gilbert_491).); (Tr. Trans. Vol. 2 at 19, ECF No. 75.)

10.     The chest X-ray revealed a mildly enlarged heart.  (J. Ex. 1 (Gilbert_536).)  Dr. Onuoha testified that a mildly enlarged heart is common and was not a reason for Johnson to return for an evaluation immediately.  (Tr. Trans. Vol. 2 at 20, ECF No. 75.)  In addition, Dr. Onuoha testified that Johnson's high cholesterol did not qualify for any treatment with medication because of his age, and that the appropriate treatment was diet and exercise, with which Johnson was doing well.  (Id. at 21-22, ECF No. 75.)

11.     On January 28, 2017, Johnson presented to sick call and was seen by Ramsey, a certified nurse practitioner with eight years experience.  (J. Ex. 1 (Gilbert_485).)  Johnson complained of nausea, vomiting, diarrhea, and abdominal pain in the epigastric region spanning over the previous twelve hours, beginning two to three hours after his last meal.  (Id. (Gilbert_485).)  In addition, he complained of low back pain.  (Id. (Gilbert_485).)  He reported his pain level was a ten on a ten-point scale.  (Id. (Gilbert_485).)

_____

[3] An S3 heart sound is a gallop that is caused by increased pressures within the left ventricle. (Tr. Trans. Vol. 1 at 46, ECF No. 74.)

12.     Ramsey's physical exam of Johnson noted normal vital signs with epigastric tenderness.
(Id. (Gilbert_485).)  Ramsey diagnosed Johnson with low back pain and unspecified abdominal
pain and ordered 800 milligrams of Ibuprofen three times a day with meals, a single dose
Promethazine suppository for nausea and vomiting, and a one-time 30 milligram injection of
Toradol for pain.  (J. Ex. 1 (Gilbert_485).)  Ramsey further advised Johnson to return for further
evaluation if his symptoms did not improve.  (Id. (Gilbert_485).)

13.     Ramsey testified that on January 28, 2017, Johnson was ambulatory and reported pain,
primarily in the abdomen, and that his condition did not appear to be emergent.  (Tr. Tans.
Vol. 1 at 139-40, ECF No. 74.)  Further, she testified that she reviewed his medical history,
medications, and prior medical visits.  In addition, she testified that she reviewed his
commissary list to evaluate whether any foods might be an issue, "especially him with his
hypertension."  (Id. at 141, ECF No. 74.)  In addition, Ramsey testified that she listened to his
bowel sounds, which also allowed her to hear heart sounds.  She testified that she did not hear
any "bruits," whooshing sounds that indicates that blood is not moving normally through the
aorta.  (Id. at 144, 154, ECF No. 74.)  Further, she did not consider Johnson's very mildly
elevated blood pressure of 148 over 60 to be alarming because of Johnson's prior hypertension
diagnosis.  (Id. at 149, ECF No. 74.)

14.     Two days later, on January 30, 2017, Johnson presented to sick call at 9:34 a.m.
Johnson's sick call request listed "stomach" as his medical problem.  (J. Ex. 1 (Gilbert_514).)
Johnson was seen by Dr. Onuoha.  (J. Ex. 1 (Gilbert_481).)  Johnson's blood pressure was 151
over 57.  (Tr. Trans. Vol. 2 at 23, ECF No. 75.); (J. Ex. 1, (Gilbert_514.)  Dr. Onuoha testified
that he was very familiar with Johnson and aware of his chronic medical conditions.  (Tr. Trans.

Vol. 2 at 25, ECF No. 75.)  Ramsey informed Dr. Onuoha that she had seen Johnson on January

28, 2017.  (Id. at 25, ECF No. 75.)  Johnson complained that he had been vomiting all week.

(J. Ex. 1 (Gilbert_481).); (Tr. Trans. Vol. 2 at 25-26, ECF No. 75.)  Further, Johnson reported

that he passed a hard stool thirty minutes prior to the sick visit but otherwise had not had any

bowel movements the previous two days.  (J. Ex. 1 (Gilbert_481).)  He complained of

continuing pain in the left flanks,[4] epigastric, and hypogastric areas of the abdomen that had not

responded to pain medication.  (Id. (Gilbert_481).)  Johnson reported that the epigastric pain

was worse with deep breathing and that his pain level was a nine out of ten.  (Id. (Gilbert_481).)

15.    Dr. Onuoha observed that Johnson was in pain.  (Tr. Trans. Vol. 2 at 26, ECF No. 75.)

Johnson's blood pressure was mildly elevated, his heart rate was 49 and 52, and his temperature

was 98.4.  (Id. at 23, 27, ECF No. 75.); (J. Ex. 1 (Gilbert_482).)  The medical record reflects that

Johnson told Dr. Onuoha that he had not taken his hypertension medication that day.  (J. Ex. 1

(Gilbert_484).)  Dr. Onuoha testified that he listened to Johnson's lungs and performed a cardiac

examination and did not hear anything different from his October 12, 2016 examination.  (Tr.

Trans. Vol. 2 at 27-28, 40, ECF No. 75.)  Dr. Onuoha testified that Johnson's primary complaint

was pain in the epigastric region of the abdomen, and he believed that the Ibuprofen Johnson

was taking for pain may have been irritating his stomach.  (Id. at 27-28, ECF No. 75.)

---

[4] In Plaintiff's "closing remarks," Plaintiff references Johnson's BOP health problem list, which
reflects a strikethrough of the diagnosis of low back pain.  The Plaintiff submits that it reflects
that "Dr. Onuoha opened the file and struck-through the diagnosis [of low back pain] on January
30th, effectively removing this documented symptom of a developing aortic dissection from the
medical record."  (Closing Remarks 6, ECF No. 81.)  To the contrary, Dr. Onuoha's medical
note on January 30, 2017, reflects that Johnson complained of flank cramping pain, and it is
undisputed that flank pain is pain in the lower sides of the back.  (J. Ex. 1 (Gilbert_481).)
Further, Ramsey's note from January 28, 2017, also reflects that in addition to primarily
complaining of abdominal pain, Johnson complained of low back pain.  (Id. (Gilbert_485).)

Dr. Onuoha testified that he examined Johnson's abdomen and ruled out appendicitis, as there was no rebound tenderness. (Id. at 28, ECF No. 75.) Dr. Onuoha prescribed Magnesium Hydroxide Suspension, also known as Milk of Magnesia, for Johnson to soothe his stomach. (Id., ECF No. 75.); (J. Ex. 1 (Gilbert_483).)

16.    After taking the Milk of Magnesia, Dr. Onuoha testified that Johnson was comfortable and at rest. (Tr. Trans. Vol. 2 at 28, ECF No. 75.) Dr. Onuoha decided to order some additional lab tests. (Id., ECF No. 75.) Dr. Onuoha ordered a urinalysis, chest X-ray, abdominal X-ray, blood work (complete metabolic profile), and urinalysis. In addition, Dr. Onuoha ordered that Ibuprofen be discontinued and replaced with Tylenol. (J. Ex. 1 (Gilbert_483).) Dr. Onuoha testified that the BOP medical chart system, "BEMR," does not allow entry of differential diagnoses, which are potential diagnoses that a physician is considering. (Tr. Trans. Vol. 2 at 30, ECF No. 75.); (Tr. Trans. Vol. 1 at 296, ECF No. 74.)

17.    Following the examination and administration of Milk of Magnesia, Dr. Onuoha testified that he asked Johnson to wait in the clinic waiting room for the results of the tests. (Tr. Trans. Vol. 2 at 31, ECF No. 75.)

18.    According to the medical records, at 11:21 a.m., the results of the chest X-ray were transmitted and at 11:31 a.m. on January 30, 2017, Dr. Onuoha reviewed Johnson's chest X-ray, which found mild heart enlargement with no change from the previous chest X-ray taken October 27, 2016. (J. Ex. 1 (Gilbert_529 - 530).) Johnson's chest X-ray showed normal mediastinal and hilar contours. (Id. (Gilbert_529 - 530).)

19.    At 12:32 p.m. the results of the abdominal X-ray were transmitted and at 1:21 p.m. on January 30, 2017, Dr. Onuoha reviewed the abdominal X-ray, which noted no significant

findings.  (Id. (Gilbert_527 - 528).)  In addition, Dr. Onuoha reviewed the urinalysis, which revealed dehydration and a moderate amount of blood in Johnson's urine.  (Tr. Trans. Vol. 2 at 33, ECF No. 75.)

20.    After reviewing the abdominal X-ray, Dr. Onuoha spoke with Johnson and informed him that the test results that had been received at that point were fine.  (Id. at 32, ECF No. 75.)  Dr. Onuoha testified that he observed that Johnson had eaten his lunch.  (Id. at 32, 36, ECF No. 75.)  Further, Dr. Onuoha asked Johnson how he was feeling and Johnson reported that he felt better.  (Id. at 32, ECF No. 75.)  Dr. Onuoha testified that Johnson was hemodynamically stable and was able to rehydrate orally at this point.  (Tr. Trans. Vol. 2 at 34, ECF No. 75.)  Dr. Onuoha instructed Johnson to return to his unit and return to medical if he had any more problems.  (Id, at 32, ECF No. 75.)  The blood work results were not available until January 31, 2017.  (J. Ex. 1 (Gilbert_515).)

21.    At 5:04 p.m. on January 30, 2017, a medical emergency was called to Johnson's housing unit.  Johnson was found unresponsive, but still breathing.  (Id. (Gilbert_475).)  Staff performed cardiopulmonary resuscitation ("CPR").  Upon arrival, emergency medical staff took control and initiated transport of Johnson.  Johnson was transported to McLeod Health Cheraw Hospital. Johnson was pronounced dead at 5:51 p.m. on January 30, 2017.  (Id. (Gilbert_475).)  The autopsy report found that Johnson's cause of death was cardiac tamponade due to ruptured aortic dissection due to hypertensive cardiac disease.  (Id. (Gilbert_538-541).)

22.    An aortic dissection is rare and occurs when the inner layer of the aorta tears and allows blood to enter the middle layer of the aorta.  (Tr. Trans. Vol. 1 at 31, ECF No. 74.)  It usually

occurs in the older population.  The aorta is the large vessel that consists of the ascending aorta

where the vessel leaves the heart and the descending thoracic aorta located in the chest area.

(Id. at 33, ECF No. 74.)  An aortic dissection is an emergent condition because it can rupture at

any time, which is fatal.  (Id. at 32-33, 38-39, 58, 91, ECF No. 74.)  It is undisputed that a

computed tomography ("CT") scan is the best imaging for diagnosing an aortic dissection.  (Id.

at 35, ECF No. 74.)  Cardiac tamponade is a condition in which fluid collects around the heart,

compressing the heart and preventing it from adequately pumping.  (Tr. Trans. Vol. 2 at 68, ECF

No. 75.)

23.       Dr. Charles Harr ("Dr. Harr"), Chief Medical Officer of WakeMed Health and Hospital

in Raleigh, North Carolina, is a practicing cardiovascular thoracic surgeon and is board certified

in surgery and thoracic surgery.  (Tr. Trans. Vol. 1 at 23, ECF No. 74.)  In addition, Dr. Harr had

a career in the United States Navy Reserves and was the 18th Medical Officer of the Marine

Corps for the United States Navy.  (Id., ECF No. 74.)

24.       Dr. Harr testified as an expert for the Plaintiff.  Dr. Harr offered all of his opinions to a

reasonable degree of medical certainty.  Dr. Harr testified that Ramsey did not deviate from the

standard of care on January 28, 2017.  (Id. at 61, ECF No. 74.)

25.       Dr. Harr testified that Dr. Onuoha deviated from the standard of care in not documenting

a cardiac exam and in not ordering a CT scan on January 30, 2017, when Johnson was seen at

9:30 a.m.  (Id. at 36-37, 65, 67, ECF No. 74.)  In addition, Dr. Harr testified that Dr. Onuoha

breached the standard of care in not ordering a CT scan after receiving test results on January 30,

2017.  (Id. at 78-79, ECF No. 74.)

26.    Dr. Harr testified that Johnson exhibited signs and symptoms of an aortic dissection

"mainly on his description of his pain and the severity of his pain," which is the most widely

observed symptom of aortic dissection.  (Tr. Trans. Vol. 1 at 34, 37, 39, ECF No. 74.)  Further,

Dr. Harr testified that back pain is the most common symptom, but that abdominal pain can also

occur with an aortic dissection.  (Id. at 50, ECF No. 74.)  Dr. Harr testified that Johnson

primarily complained of abdominal pain, but also complained of back pain.  (Id. at 85-88, ECF

No. 74.)  In addition, Dr. Harr testified that Johnson had prior risk factors for aortic dissection

including a history of smoking, hypertension, and high cholesterol.  (Id at 38, ECF No. 74.)

27.    Dr. Harr testified that advanced imaging, such as a CT scan, is always required to

diagnose an aortic dissection.  (Id. at 34, ECF No. 74.)  Further, he agreed that many other

potential conditions are more common than an aortic dissection.  Specifically, Dr. Harr testified

as follows:

> [Aortic dissections] are usually diagnosed incidentally.  Most of us don't look at
> somebody and say, you have got an aortic dissection.  But what we did say is that
> you have pain out of proportion to what you are showing with, and we really can't
> explain why that is.  So, somebody comes in, we have gone through all of the
> normal things, you know, a 35-year-old who comes in, we are going to think of, one,
> the blood clot that has gone to the chest and causing pain; two, a kidney stone, . . .
> there [are] lots of things more common than what an aortic dissection is.  But as we
> go down that list and we don't find those things, we say something is not right, and
> we keep looking until we find it.

(Tr. Trans. Vol. 1 at 34, ECF No. 74.)

28.    Dr. Harr testified that he agreed that Dr. Onuoha was considering differential diagnoses,

which is reflected by Dr. Onuoha's ordering X-rays, urinalysis, and blood work, but "would

have liked to have seen them order the next test, which would have been a CAT scan to see

this."  (Id. at 67, ECF No. 74.)  Dr. Hass testified that a chest X-ray is of limited use for

11

evaluating a potential aortic dissection.  Dr. Harr testified that "very rarely" the mediastinum

will show widening on X-ray, which is a sign of an aortic dissection, but that "you have got to

have a really good radiologist and it has to be a really big dissection or aneurysm."  (Id. at 69,

ECF No. 74.)

29.      Dr. Harr opined that Johnson's aortic dissection occurred on January 28, 2017, and his

aorta ruptured at 5:04 p.m. on January 30, 2017.  (Id at 58, ECF No. 74.)  Dr. Harr testified that

Johnson had an 80 to 90 percent chance of survival if he had the CT scan and surgery was

performed prior to the rupture of his aortic dissection.  (Id.. at 59, 79, ECF No. 74.)  Further, Dr.

Harr testified that he was not familiar with the BOP procedures for obtaining a CT scan or how

long it would take to obtain a CT scan and interpret the results.  (Tr. Trans. Vol. 1 at 71, 93-94,

ECF No. 74.)  Dr. Harr testified that the hospital is approximately an hour away from FCI-

Bennettsville.  (Id. at 92, 96, ECF No. 74.)  Further, Dr. Harr testified that timing of the CT scan

is important.  (Id. at 80, ECF No. 74.)  Dr. Harr testified that a stat CT scan would have been

performed within an hour of arriving in the hospital emergency department, and the actual CT

scan would take approximately 30 minutes to perform.  (Id. at 95-96, ECF No. 74.)  In addition,

Dr. Harr testified that a radiologist would read the CT scan and upon diagnosing an aortic

dissection, contact cardiac thoracic surgery to review the CT scan.  (Id. at 94, ECF No. 74.)

Then, Dr. Harr testified that a cardiac team would need to be assembled for surgery, which

would take an unknown period of time.  (Tr. Trans. Vol. 1 at 89, 94, ECF No. 74.)  Dr. Harr

testified that during working hours if the cardiac team is present, a patient can be in the

operating room and ready for surgery within 30 minutes.  (Id. at 99, ECF No. 74.)  Dr. Harr

stated that Mcleod Regional Medical Center, in Florence, South Carolina currently has

cardiothoracic surgeons on staff.  (Id. at 96, ECF No. 74.)  However, he stated that he did not

know if the hospital had cardiothoracic surgeons on staff in 2017.  (Id. at 100, ECF No. 74.)

Further, Dr. Harr testified that the surgery itself would take an unknown period of time to

perform.  (Id. at 95, ECF No. 74.)  Dr. Harr testified that Dr. Onuoha proximately caused

Johnson's death because "at the time he came back on the 30th, there should have been urgency

attached to that evaluation and we should have gone through on that.  So, I do believe that his

actions on the 30th [of January] contributed to [] Johnson's death, led to [] Johnson's death."

(Tr. Trans. Vol. 1 at 83, ECF No. 74.)

30.    Dr. Susan Lawrence ("Dr. Lawrence") testified via zoom from California as an expert for

the Plaintiff.  Dr. Lawrence is board certified in internal medicine and oncology.  (Id. at 156,

ECF No. 74.)  In addition, Dr. Lawrence served as a staff physician and medical director at a

federal immigration detention center for a period of three years from 2013 to 2016.  (Id., ECF

No. 74.)  She testified that all of her opinions were to a reasonable degree of medical certainty.

(Id. at 159-60, ECF No.  74.)

31.    Dr. Lawrence opined that Ramsey violated the standard of care on January 28, 2017, in

failing to conduct a cardiac exam and failing to schedule Johnson to return for reevaluation the

following day, because his cardiovascular history should have raised her "index of suspicion"

that his complaints "may be related to an underlying cardiovascular issue."  (Id. at 171-172, 174,

ECF No. 74.)

32.    Dr. Lawrence testified that Dr. Onuoha violated the standard of care in not conducting a

cardiac exam.  (Tr. Trans. Vol. 1 at 172, ECF No. 74.)  Dr. Lawrence testified that Dr. Onuoha

failed to properly consider Johnson's cardiac history and fully assess Johnson's clinical picture

based on his failure to document a cardiac exam, consider Johnson's history of "substantial" cardiovascular disease, and consider any differential diagnoses. (Id. at 180-81, 187-88, 195, ECF No. 74.) Dr. Lawrence opined that if something is not documented in the record, it did not happen. (Id, at 205-06, ECF No. 74.) Dr. Lawrence further opined that Dr. Onuoha breached the standard of care in failing to immediately send Johnson to the hospital emergency department on January 30, 2017, instead of waiting on test results upon seeing Johnson at 9:30 a.m and learning that his pain had not improved. (Id. at 189, 191, 195, 213, ECF No. 74.)

33.     Dr. Lawrence based her opinions on her more than 45 years of medical practice and her training and experience in correctional medicine. (Id. at 213, ECF No. 74.) Dr. Lawrence testified that Johnson's prior medical history reflected substantial cardiovascular disease, including multiple abnormal EKGs, substantial bradycardia, an enlarged heart, and an abnormal heart sound, and substantial risk factors for cardiovascular disease and aortic dissection, including hypertension, a history of smoking, and high cholesterol. (Tr. Trans. Vol. 1 at 184-86, ECF No. 74.)

34.     Dr. Lawrence testified that the fact that Johnson was taking three medications at one point for hypertension reflects that his hypertension was difficult to manage. (Id. at 165, ECF No. 74.) Dr. Lawrence testified that any heart rate below 60 is "substantial or severe" bradycardia. (Id. at 182, ECF No. 74.) Dr. Lawrence agreed that Johnson's heart rate at the October 12, 2016 visit was not substantially slow at 60 beats per minute, and on January 28, 2017, his heart rate was not substantially slow at 61 beats per minute. (Id. at 193-94, ECF No. 74.) Further, Dr. Lawrence testified that she did not expect Dr. Onuoha to diagnose the aortic dissection but to recognize that Johnson was very ill and needed emergency care.

14

(Id. at 198-99, ECF No. 74.)  Dr. Lawrence did not offer any opinions regarding proximate

causation.  (Tr. Trans. Vol. 1 at 195, ECF No. 74.)  Dr. Lawrence testified that she has not

personally diagnosed someone with an aortic dissection but has transferred patients for

emergency care because she suspected an aortic dissection.  (Id. at 200, ECF No. 74.)

35.     Dr. Raymond Sauer ("Dr. Sauer"), an economics professor at Clemson University,

testified as an expert economist for the Plaintiff.  Dr. Sauer testified that had Johnson lived,

upon his release from prison and earning minimum wage at $7.25 per hour, the present value of

his future earnings would be $419,164.00.   (Id. at 216, 221, 227, ECF No. 74.)

36.     Dr. Edward O'Bryan ("Dr. O'Bryan"), a board-certified internal medicine physician who

is dually credentialed in South Carolina for both internal and emergency medicine, testified as

an expert for the United States.  (Id. at 236-37, ECF No. 74.)  He has been practicing for 14

years and is currently employed as an assistant professor of emergency medicine by the Medical

University of South Carolina ("MUSC").  (Tr. Tans. Vol. 1 at 231-33, ECF No. 74.)

37.     As part of his practice, Dr. O'Bryan testified that he has routinely treated patients in the

emergency department and the chest pain clinic.  (Id. at 233, ECF No. 74.)  In addition, Dr.

O'Bryan testified that he is also the Consulting Chief Medical Officer of True Pill, which is a

company that provides healthcare infrastructure.  (Id. at 231-32, ECF No. 74.)  Further, Dr.

O'Bryan testified that he has significant past experience with the South Carolina Department of

Corrections, including performing clinical work at Charleston County Detention Center for a

number of years and conducting quality oversight for the detention center accreditation process.

(Id. at 235, ECF No. 74)  Dr. O'Bryan has past experience working with the South Carolina

Department of Corrections on healthcare infrastructure.  (Id. at 235, ECF No. 74.)  Dr. O'Bryan

testified the he recently also worked as Chief Medical Officer for Wellpath for a year and half. Wellpath is the largest correctional medicine company in the United States. (Id. at 236, ECF No. 74.) In his role as Chief Medical Officer, Dr. O'Bryan testified that he reviewed the care provided to persons incarcerated in correctional settings, and set standards for that care, "making sure that the care delivery paradigms are matching to national standards," to ensure "[t]hat it doesn't matter whether you are incarcerated or not, you deserve a high[] level of care, and that is for local detention, [s]tate detention centers, as well as Federal Bureau of Prisons." (Tr. Trans. Vol. 1 at 236, ECF No. 74.)

38.    Dr. O'Bryan testified that all of his opinions were to a reasonable degree of medical certainty. (Id. at 261, ECF No. 74) Further, he testified that he has "diagnosed several patients with aortic dissection in the emergency department" and treated several others on transfer from other hospitals to the chest pain center, and he has personal experience with an aneurysm rupture dissection, in that his father passed away from an aortic dissection. (Id. at 237, ECF No. 74.)

39.    Dr. O'Bryan testified that Ramsey did not breach the standard of care and acted the way "most [] nurse practitioners . . . would have acted in the same situation. And certainly in regards to the care that is carried out in the correctional institution, . . . [Johnson] received similar, if not the same, care that he would have gotten in the community." (Id. at 242, ECF No. 74.) Dr. O'Bryan opined that there was nothing in Ramsey's findings that indicated Johnson had an immediate life-threatening condition. (Id. at 246, ECF No. 74.) Further, Dr. O'Bryan testified that the medical record did not reflect that Ramsey performed a cardiac exam, but that it was not warranted because a focused physical exam of Johnson for a focused problem was more reasonable. (Tr. Tans. Vol. 1 at 282, ECF No. 74.)

40.    Dr. O'Bryan testified that it was extremely unlikely that any medical professional would have had an aortic dissection as a differential diagnosis for Johnson.  (Id. at 242-43, ECF No. 74.)  He testified that the incidence of aortic dissection is twenty to thirty in a million for all ages and over 80 percent of the cases are over 62 years old.  (Id. at 242-43, ECF No. 74.)

41.    Describing the risk for Johnson, Dr. O'Bryan stated that for a 35-year-old to have a dissecting aorta is incredibly unlikely and far lower than one in a million in a patient presenting with mainly abdominal pain with nausea and vomiting, which are uncommon symptoms of aortic dissection.  (Id. at 243, 258, ECF No. 74.)  Further, Dr. O'Bryan testified that nothing in Johnson's past medical history of benign essential hypertension and mildly enlarged heart altered his opinion because the EKGs were benign and the chest X-ray showing a mildly enlarged heart is normal with longstanding hypertension.  (Tr. Trans. Vol. 1 at 244, ECF No. 74.)  Dr. O'Bryan testified that Johnson's hypertension was not severe, as it was well-controlled benign essential hypertension.  (Id. at 305-07, ECF No. 74.)  Further, bradycardia on EKGs is expected in a young person without comorbidities.  (Id. at 248, ECF No. 74.)  Dr O'Bryan opined that Johnson did not have "substantial" cardiovascular disease.  (Id. at 247-48, 261, ECF No. 74.)  Further, Dr. O'Bryan noted that Johnson had high cholesterol, but did not have any dangerous atherosclerosis.  (Id. at 262, ECF No. 74.)

42.    Dr. O'Bryan testified that hypertension, smoking, and high cholesterol places a person at risk for aortic dissection.  (Tr. Tans. Vol. 1 at 262, ECF No. 74.)  However, Dr. O'Bryan testified that this risk is a cumulative risk which is why

> most dissections occur in elderly populations because when you are 35, sure you can have those things, you are probably not going to have a dissection . . . .  You might have with those conditions possibly untreated, you might have a dissection when you

are 75 . . . .  [A]nd that is why there is no recommended screening for aortic insufficiency until age 65, and only then in smokers.

(Id. at 262, ECF No. 74.)

43.     With respect to Dr. Onuoha, Dr. O'Bryan testified that "[a]lthough Mr. Johnson reported a subjective pain scale rating of ten, his ambulatory nature without a rapid deterioration or progression of symptoms, normal vital signs, nonsurgical abdomen on physical examination, and a paucity of significant risk factors altogether meant that there was no breach of [the] standard of care." (Id. at 303-04, ECF No. 74.)  Further, Dr. O'Bryan testified that on January 30, 2017, Johnson's chief complaint was abdominal pain, and in addition, Johnson complained of flank pain, which is located in the lower lateral aspect of the side/back.  (Id. at 250-51, ECF No. 74.)  Abdominal and flank pain, described as cramping, are not typical symptoms of aortic dissection, which most commonly causes chest pain and is "almost universally described as a tearing pain." (Id. at 251, 258, ECF No. 74.)  Dr. O'Bryan testified that Dr. Onuoha did not breach any standard of care in not sending Johnson immediately and emergently for a CT scan at 9:30 a.m. on January 30, 2017.

44.     Dr. O'Bryan testified that it

is an improper utilization of resources. . . . [I]t is part of our mission and well within the standard of care to treat patients appropriately at the appropriate site. . . the analysis that he underwent was very appropriate for his constellation of symptoms. He had had nausea and vomiting and now moving to the flank, so . . . looking for things like kidney stone, or small bowel obstruction, or, . . . gastroenteritis, all of the things he was looking for, which his orders basically formed the differential diagnosis, . . . was completely appropriate.

(Id. at 252-253, ECF No. 74.)

45.     Dr. O'Bryan opined that "as an emergency medicine physician [who] receives these patients on a day-to-day basis and has for 14 years," in a 35-year-old man with no other significant medical history, "[i]n this scenario, in the morning, . . . seeing the patient with this constellation of symptoms, getting the tests and awaiting the results of the tests . . . is completely appropriate."  (Tr. Trans. Vol. 1 at 254, ECF No. 74.)  Dr. O'Bryan testified that Dr. Onuoha's diagnosis in the medical record of "abdominal pain unspecified" is a diagnosis of exclusion and is a diagnosis used while a physician is continuing a work up of a patient.  (Id. at 260, ECF No. 74.)

46.     Further, Dr. O'Bryan testified that there was nothing in the record that raised a higher index of suspicion for aortic dissection.  (Id. at 255, ECF No. 74.)  Dr. O'Bryan opined that Dr. Onuoha did not breach the standard of care in not sending Johnson for emergency care after receiving the test results.  Dr. O'Bryan opined that later in the day, some of Johnson's test results raised suspicion for a kidney stone, but "that is an urgent, not [] emergent" issue and would not require Johnson to be transported emergently for care.  (Id. at 256, ECF No. 74.)  Dr. O'Bryan noted that given the lack of mediastinal hilar widening in the chest X-ray on January 30, 2017, it was more likely than not that there was no aortic dissection at that time, or that any dissection was not large enough to be visualized on X-ray.  (Id. at 257-58, ECF No. 74.)

47.     Dr. O'Bryan testified that the standard of care did not require Dr. Onuoha to perform a cardiac exam because Johnson's cardiac history was not significant to Johnson's complaints, and a focused history and physical of Johnson by Dr. Onuoha "is exactly the standard of care." (Tr. Trans. Vol. 1 at 291, ECF No. 74.)  Further, Dr. Onuoha did not breach the standard of care

in not listing differential diagnoses in the medical record and that it "is rare to have a fully fledged-out differential diagnosis in most reports." (Id. at 295, ECF No. 74.)

48.     Dr. Marc Katz ("Dr. Katz") is a board certified thoracic surgeon employed as the Chief of the Division of Cardiothoracic Surgery and holds the Fred Crawford Chair in cardiothoracic surgery at MUSC. (Tr. Trans. Vol. 2 at 63, ECF No. 75.) Dr. Katz testified that his practice sees one to two aortic dissections per month. (Id. at 63, ECF No. 75.) Dr. Katz offered all of his opinions to a reasonable degree of medical certainty. (Id. at 79, ECF No. 75.) Dr. Katz testified that aortic dissection is "rare acute event" that he described as a "medical catastrophe." (Id. at 70, ECF No. 75.) With respect to Johnson's 2015 EKG showing a low heart rate/bradycardia, Dr. Katz testified that athletic people frequently have lower heart rates and that Metoprolol can lower a person's heart rate. (Tr. Trans. Vol. 2 at 66-67, ECF No. 75.) Further, Dr. Katz testified that a diagnosis of hypercholesterolemia (high cholesterol) "really does not have much to do with aortic dissection" and "the only evidence of any cardiovascular disease" was mild hypertension and mild cardiomegaly. (Id. at 67-68, ECF No. 75.)

49.     Dr. Katz referenced the International Registry of Acute Aortic Dissection as the organization with the largest breadth of information on aortic dissections and cited its 2018 Report in support of his opinions. (Id. at 69, ECF No. 75.) Dr. Katz testified that the textbook presentation of aortic dissection is a "stabbing or searing chest pain" that pierces "through to the upper back, frequently associated with extreme hypertension, like blood pressures of 200 or more." (Id. at 70, ECF No. 75.) Dr. Katz further testified that nausea and vomiting are unusual with an aortic dissection and less than 5 percent present with abdominal pain. (Id. at 71, 83, ECF No. 75.) Further, Dr. Katz testified that the in-hospital survival rate for patients that are

candidates for surgical repair of an aortic dissection is 78 percent.  (Tr. Trans. Vol. 2 at 88, ECF No. 75.)

50.      Dr. Katz testified that in his opinion, Ramsey did not breach the standard of care because nothing in her record would cause him to consider the differential diagnosis of aortic dissection. (Id. at 74, ECF No. 75.)  Dr. Katz testified that with respect to January 30, 2017, Johnson's vital signs did not raise any concern for aortic dissection.  (Id. at 75, ECF No. 75.)  In addition, Dr. Katz testified that 80 percent of patients with aortic dissection have a widened mediastinum on chest X-ray.  (Id. at 76, ECF No. 75.)  Dr. Katz testified that Dr. Onuoha's exam on January 30, 2017, did not contain any evidence of aortic dissection.  (Id. at 79, ECF No. 75.)

## II. CONCLUSIONS OF LAW

51.      "A plaintiff has an FTCA cause of action against the government only if [the plaintiff] would also have a cause of action under state law against a private person in like circumstances."  Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991) (citing 28 U.S.C. § 1346(b); Corrigan v. United States, 815 F.2d 954, 955 (4th Cir. 1987) (per curiam)).  Under the FTCA, the court must determine liability in accordance with the substantive tort law of the state "where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Accordingly, because Plaintiff alleges a claim for medical malpractice concerning the medical treatment Johnson received while incarcerated at FCI - Bennettsville, located in South Carolina, the substantive law of South Carolina controls.

52.      To prove negligence in South Carolina, a plaintiff must show: "(1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage

proximately resulting from the breach of duty." Bloom v. Ravoira, 529 S.E.2d 710, 712 (S.C. 2000) (citation omitted).

53.    Under South Carolina law, [t]o establish a cause of action for medical malpractice, the plaintiff must prove the following facts by a preponderance of the evidence:

>    (1)    The presence of a doctor-patient relationship between the parties;
>    (2)    Recognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;
>    (3)    The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;
>    (4)    Such negligence being a proximate cause of the plaintiff's injury; and
>    (5)    An injury to the plaintiff.

Brouwer v. Sisters of Charity Providence Hosps., 763 S.E.2d 200, 203 (S.C. 2014) (citation omitted).

54.    In addition, the plaintiff "must establish by expert testimony both the standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct." Martasin v. Hilton Head Health Sys. L.P., 613 S.E.2d 795, 799 (S.C. Ct. App. 2005) (internal citation omitted). Further,

>    Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided. When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence.
>
>    Ellis v. Oliver, 473 S.E.2d 793, 795 (S.C. 1996) (citations omitted).

22

55.    "When [expert testimony] is the only evidence of proximate cause relied upon, it must

provide a significant causal link between the alleged negligence and the plaintiff's injuries,

rather than a tenuous and hypothetical connection." Id. at 795 (citation omitted).  "To establish

negligence, the plaintiff is required to prove the defendant's conduct was one of the proximate

causes of the injury, not the sole cause." Bonaparte v. Floyd, 354 S.E.2d 40, 48-49 (S.C. Ct.

App. 1987) (citing Hughes v. Children's Clinic, P.A., 237 S.E.2d 753 (S.C. 1977)).

56.    The court finds that Plaintiff has failed to prove by a preponderance of the evidence that

there was any breach of the standard of care by Ramsey on January 28, 2017.  Johnson presented

to sick call on January 28, 2017, complaining primarily of abdominal pain with nausea,

vomiting, and diarrhea and pain in the flank area of the lower side of his back.  In addition,

Johnson stated that he was suffering ten out of ten pain.  Johnson's vital signs were normal and

there were no signs of an aortic dissection or that Johnson needed immediate emergency care.

(J. Ex. 1 (Gilbert_485).)

57.    Plaintiff's own expert, Dr. Harr, testified that in his opinion, Ramsey did not breach the

standard of care on January 28, 2017.  (Tr. Trans. Vol. 1 at 61, ECF No. 74.)  Dr. Lawrence

opined that Ramsey breached the standard of care in failing to perform a cardiac exam and in not

scheduling Johnson to return for evaluation the next day.  (Id. at 171-72, 174, ECF No. 74.)

58.    The court finds that Dr. Lawrence's opinions lack credibility in light of her broad and

vague opinions that Johnson had a history of "substantial" cardiovascular disease or risk factors

for aortic dissection, which is contrary to the medical records in this case reflecting that Johnson

had mild, well-controlled benign essential hypertension and a mildly enlarged heart.  (Id. at 187-

88, ECF No. 74.); (J. Ex. 1 (Gilbert_235, Gilbert_298, Gilbert_309, Gilbert_347, Gilbert_427,

Gilbert_489, Gilbert_536).)  For example, Dr. Lawrence testified that any heart rate below 60 is "substantial or severe" bradycardia.  (Tr. Trans. Vol. 1 at 181-82, ECF No. 74.)  Dr. Hass, Dr. O'Bryan, and Dr. Katz all testified that Metoprolol, a medication that Johnson was taking when the 2015 EKG showed a heart rate of 45, lowers the heart rate.  (Id. at 80-81, ECF No. 74.); (Tr. Trans. Vol. 2 at 16-17, 67, ECF No. 75.)  Dr. Onuoha testified that he discontinued prescribing Johnson Metoprolol for this reason.  (Tr. Trans. Vol. 2 at 16-17, ECF No. 75.)  Johnson's medical records reflect that his heart rate was higher after he stopped taking Metoprolol.  (J. Ex. 1, generally).)

59.    In addition, Dr. Onuoha, Dr. O'Bryan, and Dr. Katz all testified that it is not uncommon for young, athletic or fit people to have a lower heart rate.  (Tr. Trans. Vol. 1 at 248, ECF No. 74.); (Tr. Trans. Vol. 2 at 23, 42, 50, 66-67, ECF No. 75.)  Dr. Onuoha, as the treating physician, had the opportunity to observe Johnson on multiple occasions, and he credibly testified that Johnson was athletic and very fit.  (Tr. Trans. Vol. 2 at 12-13, 23, ECF No. 75.)  Thus, Johnson's presenting with a heart rate below 60 was not "substantial" or "severe" bradycardia.

60.    In addition, the court found the testimony of Dr. O'Bryan, the United States' expert, to be highly credible.  Dr. O'Bryan has highly relevant and extensive experience in working as an emergency medicine and internal medicine physician, in evaluating care provided in a correctional setting to ensure that it complies with national standards, and in providing inmates with medical care in a correctional setting.  (Tr. Trans. Vol. 1 at 231-36, ECF No. 74.)  Dr. O'Bryan's opinion was that a cardiac exam was not warranted in a patient who presents with focused issues such as abdominal pain, nausea, and vomiting.  (Id. at 282, ECF No. 74.)

61.    Dr. O'Bryan opined that there was nothing in Ramsey's findings that indicated Johnson had an immediate, life-threatening condition.  (Id. at 246, ECF No. 74.)  Dr. O'Bryan testified that Johnson's primary complaint, abdominal pain, is an uncommon symptom of aortic dissection.  (Id. at 243, 258, ECF No. 74.)  Dr. Kratz, the United States' cardiovascular expert, testified that abdominal pain is the only symptom in less than 5 percent of aortic dissections. (Tr. Trans. Vol. 2 at 71, 83, ECF No. 75.)  In addition, Dr. Kratz and Dr. O'Bryan both testified that nausea and vomiting are not common symptoms of aortic dissection.  (Tr. Trans. Vol. 1 at 243, 258, ECF No. 74.); (Tr. Trans. Vol. 2 at 71, ECF No. 75.)

62.    In sum, the court finds Ramsey acted well within the standard of care in examining Johnson, providing medications for pain, nausea, and vomiting, and advising Johnson to return if his symptoms did not improve.  The Plaintiff has failed to meet the burden of proving by a preponderance of the evidence that on January 28, 2017, Ramsey deviated from the standard of care of a physician under same or similar circumstances.

63.    In addition, Plaintiff has failed to prove by a preponderance of the evidence that Dr. Onuoha deviated from the standard of care in his treatment of Johnson on January 30, 2017. Johnson presented to sick call at 9:34 a.m. on January 30, 2017.  (J. Ex. 1 (Gilbert_481 - Gilbert_483).)  Again, his primary complaint was abdominal pain and vomiting.  (Id.)  Johnson also complained of flank pain, which was described as cramping.  Johnson complained that his pain had not improved with prescription strength pain medication.  (Id.) Johnson's vital signs were not alarming and Johnson had no fever.  (Id. (Gilbert_482).)  His heart rate was noted as 49 and 52 and his blood pressure was mildly elevated at 151 over 57.  (Id. at 26-27, ECF No. 75.); (J. Ex. 1 (Gilbert_482).)

64.     Dr. Onuoha is the only physician who was able to observe and interact with Johnson on

January 30, 2017.  Johnson reported to Dr. Onuoha that he had not taken his blood pressure

medication that day.  (Id. (Gilbert_484).)  Further, Dr. Onuoha testified that on January 30,

2017, he was familiar with Johnson and fully aware of his medical history, which included mild

hypertension, mildly enlarged heart, and high cholesterol.  (Tr. Trans. Vol. 2 at 25, ECF No. 75.)

Dr. Onuoha's testimony as to his observations and interactions with Johnson were credible.  In

addition, Dr. Onuoha testified that Johnson's blood pressure, although mildly elevated on

January 30, 2017, was not alarming, because pain can increase blood pressure and Johnson

appeared to be in pain.  (Id. at 26, 27, 60, ECF No. 75.)

65.     On January 30, 2017, Dr. Onuoha discontinued Johnson's Ibuprofen because it can cause

stomach irritation.  (Id. at 28, 38, ECF No. 75.)  Further, Dr. Onuoha prescribed Johnson Milk of

Magnesia to "soothe the stomach."  (Id., ECF No. 75.)  Dr. Onuoha considered a number of

differential diagnoses for Johnson.  He testified that he checked for appendicitis and found no

rebound tenderness.  (Id. at 28, ECF No. 75.)  Further, he was also considering an infection or a

kidney stone.  (Tr. Trans. Vol. 2 at 33, 56-57, ECF No. 75.)

66.     Dr. Onuoha ordered additional tests, including a chest X-ray, abdominal X-ray, blood

work, and urinalysis, to rule in and/or rule out other differential diagnoses.  (Id. at 30, 31, ECF

No. 75.)  Further, Dr. Onuoha asked that Johnson remain in the waiting room of the clinic

awaiting the ordered tests and test results.  After receiving the urinalysis and X-ray results, Dr.

Onuoha observed Johnson in the waiting room and noted that Johnson had eaten lunch.  (Id. at

32, ECF No. 75.)  Further, Dr. Onuoha informed Johnson that the test result received thus far

raised no concerns.  (Id. at 32, ECF No. 75.)  Dr. Onuoha asked Johnson how he was feeling and

Johnson affirmatively stated that he felt better.  (Id. at 32, ECF No. 75.)  The urinalysis revealed that Johnson was dehydrated.  However, Dr. Onuoha felt that Johnson did not need intravenous fluids because he was tolerating food and drink orally.  (Tr. Trans. Vol. 2 at 33-34, ECF No. 75.)

67.     Dr. Harr testified that Dr. Onuoha breached the standard of care in failing to order a CT scan when Johnson presented to sick call on January 30, 2017, with unabated, out of proportion pain.  (Tr. Trans. Vol. 1 at 37, 65, 67, 98, ECF No. 74.)  In addition, Dr. Harr testified that Dr. Onuoha breached the standard of care in failing to order a CT scan after receiving the test results on January 30, 2017.  (Id. at 78-79, ECF No. 74.)  Dr. Harr opined that Dr. Onuoha breached the standard of care because Johnson's back pain and the intensity of the pain should have informed a reasonable physician that a CT scan was necessary to consider an aortic dissection.  (Id. at 35, 50, 54, 70, ECF No. 74.)  Dr. Harr testified that back pain is the most common symptom of aortic dissection.  (Id. at 50, ECF No. 74.)  However, Johnson's primary complaint was abdominal pain, not back pain.  (Id. at 86-88, ECF No, 74.)  Abdominal pain, nausea, and vomiting are uncommon signs of aortic dissection.  (Tr. Trans. Vol. 1 at 243, 258, ECF No. 74.); (Tr. Trans. Vol. 2 at 71, ECF No. 75.)  In addition, Johnson complained of flank pain, which is located on the lower sides of the back.  (Tr. Trans. Vol. 2 at 71, 84, ECF No. 75.); (J. Ex. 1 (Gilbert _481- Gilbert_486).); (Tr. Trans. Vol. 1 at 251, ECF No. 74.)

68.     Moreover, Dr. Harr also testified that he would never describe a medical test as "required" because medicine requires judgment.  Dr. Harr testified that he could only base his opinions on the medical record because he did not have the benefit of having examined Johnson himself or hearing Dr. Onouha's testimony that on January 30, 2017, Dr. Onuoha observed Johnson around lunchtime and Johnson stated that he felt better.  (Tr. Tans. Vol. 1 at 73, ECF

No. 74.) Candidly, Dr. Harr noted that if he had observed Johnson personally and Johnson reported that he was feeling better, it might have changed his opinion about the need for a CT scan. (Id., ECF No. 74.)

69.    The court finds that Dr. Lawrence's testimony that Dr. Onuoha breached the standard of care by not elevating Johnson's care immediately upon seeing him at 9:34 a.m. lacks credibility.

70.    As stated previously, the court disagrees with Dr. Lawrence's repeated description of Johnson's preexisting mild hypertension, mildly enlarged heart and two EKGs labeled abnormal as "substantial" or "severe" cardiovascular disease. (Id. at 182-84, ECF No. 74.) Further, Dr. Lawrence's opinion that Dr Onuoha's failure to perform a cardiac exam on Johnson was a breach of the standard of care is unavailing. First, Dr. Onuoha testified that he performed a cardiac exam on Johnson. (Tr. Trans. Vol. 2 at 27-28, 40, ECF No. 75.) Second, Dr. Lawrence's declaration that if a cardiac exam was not documented, it did not happen, is overly legalistic. (Tr. Trans. Vol. 1 at 172, ECF No. 74.) It overlooks the practical reality that just because it is not documented does not mean that it was not actually performed.

71.    In contrast, Dr. O'Bryan testified in highly credible testimony that Dr. Onuoha did not violate any standard of care because none of Johnson's signs or symptoms on January 30, 2017, including Johnson's preexisting conditions of mild hypertension and a mildly enlarged heart, raised any reasonable suspicion that Johnson was suffering from an aortic dissection or that he needed emergency care. (Id. at 303-06, ECF No. 74.) Dr. O'Bryan indicated that Johnson did not have severe or substantial cardiovascular issues and that mild hypertension and a mildly enlarged heart are very common. (Id. at 244, 303-04, ECF No. 74.) Dr. O'Bryan testified that the EKGs labeled "abnormal," which were read by a computer, are not abnormal. (Id. at

28

243-44, 248, ECF No. 74.)  Further, Dr. O'Bryan noted that Johnson's benign essential

hypertension was well controlled.  (Id. at 303-04, ECF No. 74.)

72.      Further, Dr. O'Bryan testified that the presence of hypertension, smoking, and high

cholesterol are risk factors for aortic dissection, but Johnson's risk factors were not significant

because these risk factors are cumulative, with the risk increasing with age, which is why

preventative screening for aortic dissections are performed in persons over 65 with a history of

smoking.  (Tr. Trans. Vol. 1 at 304-07, ECF No. 74.)

73.      Dr. O'Bryan described an aortic dissection as a one in a million occurrence in a 35-year-

old person.  Further, Dr. O'Bryan testified that the number was much lower in Johnson's case

because his primary complaint was abdominal pain, which is an uncommon symptom of aortic

dissection.  (Id. at 243, 251, 258, ECF No. 74.)  Dr. O'Bryan agreed with Dr. Onuoha's decision

to order further testing and await results to consider other potential causes of Johnson's

symptoms.  (Id. at 252-255, ECF No. 74.)  Dr. O'Bryan noted that Johnson's signs and

symptoms did not reflect anything emergent and there was no indication that Johnson's care

needed to be elevated or that a CT scan needed to be emergently ordered at 9:34 a.m. on January

30, 2017.  (Id. at 255-57, ECF No. 74.)  Further, Dr. O'Bryan noted that nothing in the test

results revealed any emergent condition that warranted immediate transport for a CT scan or

emergency care after receiving test results.  (Id. at 253-54, 255-57, ECF No. 74.)

74.      Dr. Katz's testimony also supported Dr. O'Bryan's opinion wherein he testified that

based on the 2018 report by the International Registry of Acute Aortic Dissection, less than 5

percent of people present with only abdominal pain for an aortic dissection.  (Tr. Trans. Vol. 2 at

69-71, 83, ECF No. 75.)  Further, Dr. Katz testified that the medical record from January 30,

2017, did not contain any evidence of aortic dissection. (Id. at 79, ECF No. 75.)  Dr. Katz

testified that the "only evidence of any cardiovascular disease" was mild hypertension and mild

cardiomegaly. (Id. at 68, ECF No. 75.)  Further, Dr. Katz testified with an aortic dissection, the

back pain is typically described as upper back pain. (Id. at 70, 84, ECF No. 75.)

75.    Dr. Katz testified that a chest X-ray can identify mediastinal widening in 80 percent of

cases, which is an indicator for aortic dissection. (Id. at 92, ECF No. 75.)  Johnson's chest X-

ray on January 30, 2017, did not show any widening and was unchanged from his previous chest

X-ray. (J. Ex. 1 (Gilbert_529 - Gilbert_530).)  Dr. Katz testified that nothing in Dr. Onuoha's

examination of Johnson on January 30, 2017, raised any alarm that Johnson needed emergency

care. (Tr. Trans. Vol. 2 at 79, ECF No. 75.)

76.    In sum, and for all the foregoing reasons, the court finds that Plaintiff has failed to prove

by a preponderance of the evidence that Dr. Onuoha breached the standard of care in failing to

order a CT scan upon seeing Johnson on January 30, 2017, at 9:34 a.m. or after receiving test

results on January 30, 2017.  Based on Johnson's signs and symptoms and preexisting health

conditions and risk factors, Dr. Onuoha acted reasonably in not having considered aortic

dissection as a differential diagnosis and in not emergently ordering a CT scan.  Dr. Onuoha

acted reasonably in ordering additional tests to determine the cause for Johnson's pain and

awaiting the results of those tests.

77.    Further, Dr. Onuoha acted reasonably in returning Johnson to his unit when Johnson

reported to Dr. Onuoha that he felt better once he had eaten lunch and the test results did not

reveal anything emergent.  Based on Johnson's presenting signs and symptoms on January 30,

2017, Plaintiff has failed to meet its burden of proving by a preponderance of the evidence that

Dr. Onuoha deviated from the standard of care of a physician under the same or similar circumstances.

78.    Moreover, even if Dr. Onuoha violated the standard of care on January 30, 2017, the court finds that the Plaintiff has failed to prove by a preponderance of the evidence that Dr. Onuoha's failure proximately caused Johnson's death.[5]  Johnson presented to sick call on January 30, 2017 at 9:34 a.m.  Dr. Onuoha ordered additional testing, including an abdominal X-ray, chest X-ray, urinalysis, and blood work.  The chest X-ray results were transmitted at 11:21 a.m. and reviewed by Dr. Onuoha at 11:31 a.m.  (J. Ex. 1 (Gilbert_529 - Gilbert_530).)  The abdominal X-ray results were transmitted at 12:32 p.m. and reviewed by Dr. Onuoha at 1:21 p.m.  (Id. (Gilbert_527 - Gilbert _528).)  The urinalysis was completed at 1:51 p.m.  (Id. (Gilbert_479).)

79.    Dr. Harr testified that Dr. Onuoha proximately caused Johnson's death because Dr. Onuoha should have ordered a CT scan after seeing him on January 30, 2017, and Johnson reported that his pain was a 9 out of a 10.  (Tr. Trans. Vol. 1 at 98, ECF No. 74.)  Dr. Lawrence, whose testimony was not credible, testified that Dr. Onuoha should have sent Johnson to the hospital emergency department immediately upon seeing him at 9:30 a.m. before receiving any test results.  (Id. at 191, ECF No. 74.)  Dr. Lawrence offered no opinions as to proximate causation.  (Id. at 195, ECF No. 74.)

80.    With respect to cause, Dr. Harr specifically testified as follows:

_____

[5] Plaintiff offered no evidence that Ramsey's actions proximately caused Johnson's death.  Dr. Harr testified that she did not violate any standard of care, and Dr. Lawrence offered no opinion as to causation.  (Tr. Trans. Vol. 1 at 82, 194-95, ECF No. 74.)  Therefore, even if Ramsey breached any standard of care, Plaintiff has failed to prove by a preponderance of the evidence that any breach by Ramsey was a proximate cause of Johnson's death.

His aortic dissection caused his death; however, the lack of our ability, as medical professionals to diagnose that, led to his death.  So, yes, I do believe that at the time he came back on the 30th, there should have been urgency attached to that evaluation and we should have gone through on that.  So, I do believe that his actions on the 30th contributed to Mr. Johnson's death, led to Mr. Johnson's death.

(Id. at 83, ECF No. 74.)

81.     Dr. Harr also testified that between lunchtime and 5:00 p.m. on January 30, 2017, Johnson should have received a CT scan.  (Tr. Trans. Vol. 78-79, ECF No. 74.)  Dr. Harr testified that he did not know if a CT scan was available at FCI - Bennettsville.  (Id. at 78, ECF No. 74.)  Dr. Harr is not familiar with the BOP procedures for obtaining a CT scan of a federal inmate from an outside hospital and did not know how long it would take to obtain a CT scan.  (Id. at 71, 93, ECF No. 74.)  Dr. Harr and Dr. Lawrence both testified that they did not expect Dr. Onuoha to diagnose an aortic dissection, but to order a CT scan.  (Id. at 72, 198, ECF No. 74.)  Dr Harr testified that **if** (1) Johnson was transported to a facility for a CT scan, (2) Johnson received a CT scan which diagnosed the aortic dissection, (3) a cardiac team was assembled for emergency surgery, and (4) the surgery was performed before the aortic dissection ruptured around 5:00 p.m. on January 30, 2017, Johnson had an 80 to 90 percent chance of survival.  (Id. at 78-79, 89, ECF No. 74.)  Dr. Harr also testified, however, that even if the rupture had occurred in the hospital emergency department, Johnson still would have died.  (Tr. Trans. Vol. 1 at 90, ECF No. 74.)  In fact, Dr. Harr testified that if the patient is not on the operating table with the chest open before it ruptures, an aortic dissection is fatal.  (Id. at 91, ECF No. 74.)  The bottom line is that all of these steps would have taken an unknown amount of time due to the nature of incarceration and the unknown procedural steps that would have to be undertaken

to transport an inmate for emergent care in addition to the many steps that would have to occur

after transport.

82.    Even if Johnson had been transported to the hospital emergency department, the hospital

was approximately an hour away.  Further, Dr. Harr and Dr. Lawrence both testified that they

did not know if the hospital had the capability to perform surgery to repair an aortic dissection in

2017.  (Id. at 92, 190, ECF No. 74.)  Once a patient arrives at the hospital, it takes time to

evaluate a patient and arrange and obtain a CT scan.[6]  Dr. Harr testified that the CT scan takes

approximately thirty minutes, but this does not include the time it would take to evaluate

Johnson in the emergency department, schedule a CT scan, transport Johnson for the CT scan,

and read and receive results of the CT scan from a radiologist.  (Id. at 93-95, ECF No. 74.)

83.    Upon completion of the CT scan, it would have taken an unknown period of time to

(1) assemble a cardiac team, who may or may not have been on site and immediately available,

(2) secure and set up an operating room, which may or may not have been immediately

available, (3) prepare Johnson for surgery, and (4) perform a successful surgery.  (Id. at 94-95,

ECF No. 74.)

84.    Proximate cause in this case is speculative and based on far too many "ifs."  Even if a

CT scan had been ordered, there were numerous steps that would have had to occur to reach the

point of actually performing the surgery to repair the aortic dissection.  The Plaintiff has failed

to prove by a preponderance of the evidence that Dr. Onuoha's failure to obtain a CT scan most

probably caused Johnson's death from an aortic dissection.

---

[6] Even if a CT scan was ordered "STAT," Dr. Harr testified that it could have taken up to an
hour to obtain the CT scan.  (Tr. Trans. Vol. 1 at 96, ECF No. 74.)

85.    Unfortunately, even if the CT scan had been ordered by Dr. Onuoha on January 30, 2017, or Dr. Onuoha had Johnson transported to the hospital emergency department, the Plaintiff has failed to prove by a preponderance of the evidence that surgery most probably could have been performed in time to repair the aortic dissection before it fatally ruptured at 5:00 p.m.  Based on the foregoing, the Plaintiff has failed to carry the required burden of proof by a preponderance of the evidence that, even assuming that Dr. Onuoha deviated from the standard of care in some fashion, any deviation was a proximate cause of Johnson's death.  Therefore, it is

**ORDERED** that the court finds for the United States on Plaintiff's medical malpractice claims.  The Clerk is directed to enter judgment for the United States.

**IT IS SO ORDERED.**


s/ Henry M. Herlong, Jr.
Senior United States District Judge


Greenville, South Carolina
May 23, 2022